## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Cr. No. 10-1445 RB |
| | ) | |
| JAMES W. LANKFORD, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW
## AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

THIS MATTER comes before the Court on Defendant James W. Lankford's Motion to Suppress Evidence. (Doc. 64.)  Defendant asserts that, following a valid traffic stop, officers unlawfully seized his pick-up truck without probable cause in violation of the Fourth Amendment, that the warrant the officers subsequently obtained to search the vehicle was not supported by probable cause, and that the good-faith exception does not apply in the case at hand.  Accordingly, Defendant asks this Court to suppress any evidence seized as fruit of the poisonous tree.  Having carefully considered the parties' filings, the relevant case law, and the evidence presented at the hearing on October 4, 2010, the Court denies Defendant's Motion to Suppress.

## FINDINGS OF FACT

At a hearing before this Court on October 4, 2010, the government presented the testimony of Officer Scott Esquivel of the Lordsburg Police Department, Sergeant Arthur De La Garza of the Lordsburg Police Department, and Agent Luke De La Garza of the Border Operations Task Force. Additionally, the government provided the Court with a CD recording of the traffic stop

(Gov't Ex. 1) obtained from a dashboard-mounted camera in Officer Esquivel's police cruiser and a microphone worn by Officer Esquivel.  Based on this evidence, the Court makes the following findings of fact:

1.      On February 16, 2010, Sgt. Rodney Plowman of the Lordsburg Police Department informed Sgt. Arthur De La Garza that he received a tip from a reliable confidential informant that Michael Jones, accompanied by an individual named Jake, would be transporting approximately six ounces (170 grams) of methamphetamine from Tucson, Arizona in a white Ford F-150 pickup truck with a large dent in the passenger side, and arriving in Lordsburg, New Mexico later that day.  Sgt. De La Garza then relayed this information to other officers coming on duty that evening during their shift briefing at 10:00 p.m.

2.      Sgt. Arthur De La Garza knew Sgt. Plowman's confidential informant to be reliable based on past experience.  Additionally, Sgt. De La Garza knew that Sgt. Plowman had been a successful narcotics officer based on this informant and the information that he provided.

3.      At approximately 12:55 a.m. on February 17, 2010, Officer Scott Esquivel of the Lordsburg Police Department spotted a white Ford F-150 pickup truck matching the description provided by the informant traveling eastbound on Motel Boulevard.  Officer Esquivel followed the vehicle and noticed that the driver was going 20 m.p.h. in a 30 m.p.h. zone and was having difficulty maintaining his lane.  The truck crossed over the double striped line in the middle of the road and then over the white fog line on the right-hand side.  Officer Esquivel initiated his emergency equipment to perform a traffic stop.  At 12:55.36 a.m., Officer Esquivel initiated his dashboard-mounted camera, and in the video, the white Ford F-150 pickup truck can be seen slowly coming to a stop on the right hand side of the road.

4.      Officer Esquivel approached the driver's side of the vehicle and immediately recognized the

2

driver as Michael Jones.  Officer Esquivel did not recognize Defendant, who was riding in the passenger's seat, as the person identified as Jake in the informant's text message; however, according to Sgt. Arthur De La Garza, who arrived on scene shortly after Officer Esquivel, Defendant's street name was Jake.  Accordingly, when Sgt. De La Garza received the tip, he suspected Defendant was the person identified as Jake in the text.

5.    Officer Esquivel told Mr. Jones why he had stopped him—failure to maintain his lane—and asked for his driver's license and registration.  When Mr. Jones produced the requested documents, Officer Esquivel noticed that Mr. Jones' hands were visibly shaking.  Officer Esquivel asked Mr. Jones if he was nervous.  He replied that he was not.  Officer Esquivel then asked Mr. Jones to put his hand out in front of him to confirm that he was shaking.  Officer Esquivel observed that Mr. Jones was noticeably shaking.

6.    Officer Esquivel observed a box of empty beer cans in the bed of the pickup truck and asked Mr. Jones if they had been drinking.  Mr. Jones stated that they had not, and that Defendant had been collecting the cans.  Although Officer Esquivel was initially suspicious that Mr. Jones may have been driving under the influence, and that this might explain his nervousness, he did not smell any alcohol, and after conversing with Defendant, he determined this was not the case; however, having dispelled this theory, Officer Esquivel's suspicions that some other form of criminal activity was afoot were heightened.

7.    Officer Esquivel asked Mr. Jones to accompany him to his police cruiser so that he could issue a citation.  Officer Esquivel inquired where he and Defendant were coming from.  Jones replied, "Silver City.  We're just on our way to Jake's, er, my house right here.  We took a transmission over there to match it up, but it didn't match up."

8.    There was a used transmission located in the back of the pickup truck, corroborating

Mr. Jones' story.

9.     Mr. Jones indicated to Officer Esquivel that the vehicle belonged to the passenger, James Lankford, who Mr. Jones referred to as "Jake."

10.    Officer Esquivel walked back to the pickup truck and opened the driver's side door to obtain the vehicle identification number (VIN).  While he was looking at the VIN, Officer Esquivel asked Defendant whether the truck belonged to him and where they were coming from. Defendant stated, "From Silver, we were up there working on a transmission."  Officer Esquivel then asked, "Where you guys headed?"  Defendant responded, "Home."  He then explained that Mr. Jones lived nearby, that he was going to drop him off, and then continue on to his home in the Goat Hills region of Lordsburg.

11.    At 1:00.00 a.m., Officer Esquivel shut the door to the pickup truck and returned to the police cruiser.  By this time, Sgt. Arthur De La Garza of the Lordsburg Police Department, who was Officer Esquivel's supervisor, had arrived on scene to assist.  Officer Esquivel took a break from his investigation at this point to converse with Sgt. De La Garza and put on a coat due to the cold temperatures.

12.    At 1:01.47 a.m., Officer Esquivel asked Sgt. De La Garza, "Do you think I have enough?" Sgt. De La Garza inquired, "How was he?"  Officer Esquivel responded, "He was shaky."

13.    At 1:02.08 a.m., Officer Esquivel returned to his questioning of Mr. Jones.

14.    Officer Esquivel asked Mr. Jones, "You said you were coming from Silver?"  Mr. Jones responded, "Yah.  From Chino, up around Arenas Valley."  Officer Esquivel asked, "And you were doing what?"  Mr. Jones responded, "We were gonna get another transmission, but the one we went to go get didn't match the one that we got in the back of the truck, so we couldn't get it."  Officer Esquivel asked, "From who?"  Mr. Jones responded, "Caballero,

4

ya know."  Officer Esquivel persisted, "Yah, but from who?"  Sgt. De La Garza then interjected, "Like which person, where did you guys go meet up there, where are you guys getting this transmission out of?"  Mr. Jones responded, "Right there, ya know where the turnoff is there to, uh, I guess the state highway department, right before you get to Chino, there's like a gas station, wrecking yard right there, we met the guy right there in the parking lot." Officer Esquivel then asked, "What was the guy's name?"  Mr. Jones responded, "Johnny, I think, Johnny . . . I don't know his last name."  Officer Esquivel asked, "You barely even know him, or what?"  Mr. Jones replied, "Yah.  We called him when we left here."  Officer Esquivel inquired, "How did you know how to call him, if you barely even knew him?"  Mr. Jones replied, "Nick Reich gave me his number.  Nick Reich is the one who needs the transmission, I went up there for him.  He don't got a driver's license."  This exchange ended at 1:03.37 a.m.

15.     The officers then conferred with each other again, and at 1:03.34 a.m., Sgt. De La Garza approached the pickup truck to speak with Defendant.  Because Sgt. De La Garza did not have a microphone, the audio from this exchange was not recorded.

16.     While Sgt. De La Garza was speaking with Defendant in the pickup, Officer Esquivel continued to converse with Mr. Jones.  Officer Esquivel asked, "How long were you guys up there for?"  Mr. Jones replied, "Couple hours.  Ya know we took our time coming back. We've been up there all afternoon."  Mr. Jones then asked, "Is that alright, is there a problem?"  Officer Esquivel responded, "Oh no, ya know, we're just, I'm just doing my regular every day job, ya know, what I ask you all the questions all of the time."  Mr. Jones continued, "Then, what are you writing me a ticket for?"  Officer Esquivel answered, "For roadways and lanes because you hit the white line over there by Smith's Ford."

17.     Sgt. De La Garza talked to Defendant for approximately one minute, and at 1:04.57 a.m., he walked back to the police cruiser.  When Sgt. De La Garza asked Defendant about where they had been and what they had been doing, Defendant did not say anything about meeting someone named Johnny.  Sgt. De La Garza found this inconsistent with Mr. Jones' story.

18.     Back at the police cruiser, Sgt. De La Garza asked Mr. Jones how long they had been over there.  Mr. Jones responded, "This afternoon.  All afternoon.  We left here about three, something like that, three or four."  Sgt. De La Garza then asked, "And what did you do over there?"  Mr. Jones responded, "We went to get a tranny, but like I said, it didn't match up."  The officers then conversed among themselves.

19.     At 1:06.45 a.m., approximately thirteen minutes after the stop was initiated, Officer Esquivel issued a citation and returned Mr. Jones' documentation.  Officer Esquivel stated, "Alright, your registration, your insurance for the vehicle, your driver's license.  What I'm going to do is issue a citation for roadways and lanes."  Mr. Jones then signed the citation, and Officer Esquivel told him, "Alright, there you go.  You have a safe night, alright."

20.     At 1:08.17 a.m., as Mr. Jones turned to walk away, Officer Esquivel inquired if he could ask a couple more questions.  Jones agreed.

21.     Officer Esquivel then stated, "During the stop, whenever you were getting your registration or insurance, it looked like you were really shaky, like you were nervous or something."  Mr. Jones responded that he was cold.  Officer Esquivel continued, "Your stories were conflicting.  You said you went up there to get a transmission because it didn't match up with the one that you were going to get for the vehicle, and you were going to pick it up with some guy named Johnny.  The guy in the truck says you guys just went up there to *work* on a transmission."  Mr. Jones responded, "I'm telling you what we went up there and did, you

6

can ask Johnny Reich, er Nick Reich, he's the one that sent me up there, O.K."  Officer

Esquivel then asked, "Do you have any illegal items in the vehicle, such as marijuana, any

meth, any cocaine, anything like that."  Mr. Jones indicated that he did not.

22.    During this voluntary questioning, Officer Esquivel did not become aware of any additional

facts that increased his suspicions of illegal activity.

23.    At 1:09.07 a.m., Officer Esquivel asked Jones for permission to search the truck.  Jones

refused, stating that the truck belonged to Defendant.

24.    Officer Esquivel then approached the passenger's side of the truck, opened the door, and

talked to Defendant.  Officer Esquivel stated, "Alright, what I'm doing right now is, I'm

going to ask you for consent to search, O.K., because based on his stop, his nervousness, and

the conflicting stories, O.K., he said that you guys went up there to pick up a transmission

from some guy named Johnny."  Defendant responded, "I don't know the guy."  Officer

Esquivel continued, "You said that you guys went up there to work on a transmission."

Defendant responded, "Well, that's what he was doing, but he picked it up because it didn't

fit."

25.    Officer Esquivel asked Defendant to step out of the vehicle.  He then explained that

Mr. Jones had refused consent to search the truck, telling the officers that it was Defendant's

vehicle.  Officer Esquivel stated, "Well, I asked him for consent to search, and he asked me,

since it's not his vehicle, it's your vehicle."  Defendant responded, "No. You can't search

my truck."  Officer Esquivel then stated, "Why don't you come back here with us," and

Defendant accompanied Officer Esquivel back to the police cruiser.

26.    At the cruiser, the officers performed pat down searches of Defendant and Mr. Jones.  No

drugs or other contraband were found during the searches.

7

27.     The officers then asked Defendant and Mr. Jones to remove their boots so that they could

        be searched.  No drugs or other contraband were found during the searches.

28.     Mr. Jones and Defendant were informed that they could leave, and they left the scene on

        foot, walking the approximately quarter mile to Mr. Jones' house.

29.     The truck was towed to the Lordsburg Police Department where it was sealed with evidence

        tape, videotaped, and kept inside a bay until a search warrant was obtained.

30.     Sgt. Arthur De La Garza related the incidents of the traffic stop to Agent Luke De La Garza

        of the Border Operations Task Force who prepared the search warrant and affidavit.  After

        the warrant and affidavit were prepared, Sgt. De La Garza reviewed it for accuracy.  The

        warrant was faxed to New Mexico State District Judge Johnson of the Sixth Judicial District

        Court in Hidalgo County, who signed it, and then faxed it back to the officers.  The affidavit

        attached to the warrant included the following indicia of probable cause:

> A.     For the past several months the Border Operations Task Force and the
>        Lordsburg Police Department have been working together to establish a Drug
>        Trafficking Organization (DTO), involving two (2) of the main drug
>        traffickers in the Lordsburg area, Tommy SONTOYA and Mike JONES.
> B.     On February 17, 2010 Sgt. Rodney Plowman of the Lordsburg Police
>        Department received a text message from a confidential informant (CI),
>        stating that Mike JONES and another white subject named Jake were coming
>        back into Lordsburg with about six (6) ounces of (ICE) methamphetamines
>        from Tucson.  The CI texted Sgt. Plowman that the subjects would be driving
>        a white Ford F-150 with a big dent on the right hand passenger side of the
>        truck.
> C.     At about 0100hrs Officer Scott Esquivel of the Lordsburg Police Department
>        was patrolling in Lordsburg NM.  Officer Esquivel observed the vehicle
>        matching the description Sgt. Plowman had given him.  The white Ford
>        F-150 was traveling East on Motel Dr. occupied by two (2) subjects fitting
>        the description Sgt. Plowman had given him.  Officer Esquivel followed the
>        vehicle and observed the vehicle cross the center stripe line once and came
>        back across and crossed the white solid fog line.
> D.     Officer Esquivel then activated his emergency equipment and conducted a
>        traffic stop on this vehicle.  The vehicle failed to stop for approximately
>        one (1) block.  Officer Esquivel approached the driver side of the vehicle and

observed the driver roll down his window.  Officer Esquivel identified the driver as Mike JONES and requested his driver's license and documentation on the vehicle.  While JONES handed his documents to Officer Esquivel he observed that JONES hand was shaking noticeably.  Officer Esquivel questioned JONES if he was nervous and requested JONES to hold his hand out so Officer Esquivel could confirm the nervousness he observed.

E.      Officer Esquivel requested JONES step out of his vehicle so he could issue a citation for the traffic violation.  Officer Esquivel observed empty beer cans in back of the truck and questioned JONES if he had consumed alcohol.  JONES denied drinking and said James had been collecting beer cans.  While issuing the traffic citation Officer Esquivel engaged in conversation with JONES and asked where he was coming from.  JONES told Officer Esquivel he was coming from Silver City, NM.  JONES stated that he was picking up a transmission from a subject named Johnny whom he didn't know his last name.  He later changed his story and told Officer Esquivel he had gone to Chino and then finally stated that he was in Arenas Valley, which seemed to Officer Esquivel he was changing his whereabouts.  Officer Esquivel then verified the VIN of the vehicle with the registration papers, while doing so Officer Esquivel engaged in conversation with the passenger James LANKFORD, the owner of the vehicle verified by JONES.  LANKFORG [sic] told Officer Esquivel they were coming back from Silver City, NM.  While in conversation Sgt. Art De La Garza asked LANKFORD what they had gone to do in Silver City.  LANKFORD told Sgt. De La Garza that JONES was working on a transmission in Silver City, NM.  LANKFORD had also said they had not met anybody while they were in the Silver City area.

F.      Officer Esquivel then completed the traffic citation and gave JONES back all his documents.  Officer Esquivel then told JONES he was free to leave; as JONES walked away Officer Esquivel engaged in a consensual encounter with JONES and asked if he could ask him several other questions.  JONES agreed.  Officer Esquivel then told JONES during the traffic stop he observed him to be nervous noticeably and his and LANKFORD'S whereabouts were conflicting because LANKFORD had told Sgt. De La Garza that he and LANKFORD had been in Silver City all day working on a transmission and had not had contact with anybody.  Officer Esquivel told JONES that his story was that they had gone to retrieve a transmission from a subject named Johnny with an unknown last name.  JONES told Officer Esquivel that LANKFORD didn't know.  Officer Esquivel then thought it reasonable to request consent to search the vehicle.  Officer Esquivel asked JONES if there was any illegal contraband in his vehicle.  JONES looked back at the vehicle and denied saying NO.  JONES denied consent to vehicle because the vehicle did not belong to him.  Office Esquivel then explained to LANKFORD the inconsistencies he noticed in both subjects stories and requested consent to search the truck.  LANKFORD denied consent.

G.      Sgt. De La Garza contacted Agent Luke De La Garza of the Border

Operations Task Force who told Sgt. De La Garza to secure and seize the vehicle so that a search warrant would be written. The vehicle was escorted to the Lordsburg Police Department to await the search warrant.

(Gov't Ex. 2.)

31.     After obtaining the signed search warrant, the officers conducted a search of Defendant's vehicle and found 70.31 grams (2.48 ounces) of methamphetamine in a plastic, vacuum-sealed bag underneath a box of empty beer cans in the bed of the truck.

32.     Defendant did not contest the validity of any of the statements in the search warrant affidavit or cross-examine the officers at the hearing with regard to the validity of the affidavit or their statements, nor did Defendant assert that the affidavit contained any potentially misleading statements or omissions.

33.     Defendant did not contest the validity of the initial traffic stop at the hearing or in his memoranda. Indeed, at the hearing, Defendant's attorney stated, "I don't have any problem with the stop." Rather, Defendant argues that the officers did not have probable cause at the point they released Defendant and Mr. Jones and transitioned to a consensual encounter, and that they did not develop probable cause during their subsequent questioning of the suspects.

## CONCLUSIONS OF LAW

*The Seizure of Defendant's Vehicle Was Supported by Probable Cause*

1.     "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). Defendant was pulled over and given a ticket for failing to maintain his lane. Defendant does not contest the validity of the initial traffic stop.

2.     Additionally, the traffic stop, which lasted approximately thirteen minutes, does not appear

to have been unreasonable in duration, and Defendant does not contest the duration of the stop. *See United States v. Lyons*, 510 F.3d 1225, 1236 (10th Cir. 2007) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver may become unlawful if it is prolonged beyond the time reasonably required to complete that mission."); *United States v. Sharpe*, 470 U.S. 675, 686 (1985) ("In assessing whether a detention is too long in duration . . . , we . . . examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly . . . .").

3.    Furthermore, there does not appear to be anything out of the ordinary with the officers' questions about Mr. Jones' and Defendant's trip, as the Tenth Circuit has held that "during [a] stop, an officer may ask routine questions about the driver's travel plans." *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005); *see also United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001).

4.    Finally, Defendant does not contest the voluntariness of his continued detention after Officer Esquivel asked Mr. Jones if he could ask him a few more questions.  When a driver voluntarily consents to an officer's additional questioning, there has been no seizure, and therefore, the Fourth Amendment is not implicated. *Bradford*, 423 F.3d at 1158; *United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir. 1994).

5.    Accordingly, the only issue before the Court is whether the seizure of Defendant's truck was supported by probable cause.  Defendant argues that the officers never had probable cause to search the vehicle, and therefore, the Court must suppress any evidence seized during the subsequent search as fruit of the poisonous tree.

6.    While the officers only needed reasonable suspicion to conduct the traffic stop, the prolonged seizure of Defendant's vehicle cannot be justified by reasonable suspicion alone;

11

thus, for the seizure to be valid, the officers must have had probable cause to seize the truck at the outset based on the informant's tip, or, at some point during the traffic stop, probable cause must have arisen. *Chambers v. Maroney*, 399 U.S. 42, 51 (1970); *West*, 219 F.3d at 1178 ("It is well established that although probable cause to search a car may not exist when a car is first stopped for a traffic citation, it can arise during the course of the stop.").

7.   The officers were not required to obtain a warrant before seizing Defendant's vehicle, provided they had probable cause.  A car suspected of carrying contraband is exempted from the warrant requirement of the Fourth Amendment because "the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained." *Chambers*, 399 U.S. at 51; *see also Carroll v. United States*, 267 U.S. 132, 154 (1925) ("[T]hose lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.").

8.   To determine if probable cause existed, the Court must look to see whether, under the totality of the circumstances, there was a fair probability that the car to be searched contained contraband. *United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238 (10th Cir. 2004).  Additionally, "[p]robable cause exists where the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Ledesma*, 447 F.3d 1307, 1316 (10th Cir. 2006).  "In determining whether probable cause exists, an officer may draw inferences based on his own experience." *United States v. Mercado*, 307 F.3d 1226, 1230

12

(10th Cir. 2002).  Probable cause is, however, necessarily an objective determination, and "[t]he subjective belief of an individual officer as to whether there was probable cause . . . is not dispositive." *United States v. Davis*, 197 F.3d 1048, 1051 (10th Cir. 1999).  In the end, the Court's determination must be based on the totality of the circumstances, as it "may not engage in a 'divide-and-conquer' analysis of the facts to determine whether probable cause existed." *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004).

9.      A reliable confidential informant's tip can be considered as one of many factors in the totality of the circumstances when determining whether the police possessed probable cause to seize a suspect's vehicle. *See United States v. Holmes*, 311 F. App'x 156, at 159–60 (10th Cir. 2009) (finding that a confidential informant's tip, along with other observations was sufficient to provide officers with reasonable suspicion); *United States v. Traxler*, 477 F.3d 1243, 1247 (10th Cir. 2007) ("confidential informant's tip can factor into the totality of the circumstances supporting probable cause"); *United States v. Carter*, 64 Fed. Appx. 109, 115 (10th Cir. 2003); *United States v. Arzaga*, 9 F.3d 91, 94 (10th Cir. 1993).

10.     Standing alone, however, a confidential informant's tip may not be sufficient to support a finding of probable cause, particularly where there are no additional facts to support the reliability of the informant or the information provided by the informant. *See Illinois v. Gates*, 462 U.S. 213, 227–31 (1983).

11.     In the case at hand, however, there are additional indicia of reliability.  First, the informant who provided the tip had been used on previous occasions and was known to be reliable by Sgt. De La Garza. *See United States v. Jenkins*, 313 F.3d 549, 554 (10th Cir. 2002) (concluding that when the identity of an informant is known, agents can "hold him responsible if his allegations turned out to be fabricated"); *United States v. Brown*, 496 F.3d

1070, 1076 (10th Cir. 2007) (recognizing that when an informant makes his identity readily known he is "not free to lie with impunity").  This indicia of reliability alone may be sufficient to support a finding of probable cause. *Gates*, 462 U.S. at 233 ("If, for example, a particular informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip.").

12.    Second, the credibility of the tip was further supported by the specificity of the details provided to the officers and their ability to confirm this information through their observations. *See id*. at 241–46 ("Our decisions applying the totality-of-the-circumstances analysis outlined above have consistently recognized the value of corroboration of details of an informant's tip by independent police work."); *Spinelli v. United States*, 393 U.S. 410, 427 (1969) ("Because an informant is right about some things, he is more probably right about other facts . . . ."); *Draper v. United States*, 358 U.S. 307, 313 (1959) (finding that probable cause existed where officer "had personally verified every facet of the information given him by [informant] except whether [suspect] had accomplished his mission and had the three ounces of heroin on his person or in his bag"); *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2002) ("When there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant.").  The tip was very specific in its description of the vehicle, the occupants of the truck, and when and by which route it would be arriving to Lordsburg.  These details, and the officers' ability to confirm them through their on-scene observations, increased the reliability of the information provided by the confidential informant, and under a totality-of-the-

14

circumstances analysis, weigh heavily in favor of a finding that probable cause existed for the seizure of the vehicle.

13.   Additionally, Mr. Jones' nervousness added to the officers' suspicion that criminal activity was afoot.  While some level of nervousness is to be expected in any police-citizen encounter, *Ledesma*, 447 F.3d at 1318, Officer Esquivel indicated that Defendant's shakiness was more extreme than normal, and in determining whether Mr. Jones was abnormally nervous, the Court must give "appropriate deference to a trained officer's ability to 'distinguish between innocent and suspicious circumstances.' " *Williams*, 271 F.3d at 1269 (quoting *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997)).

14.   Finally, the Court concludes that the inconsistencies between Mr. Jones' and Defendant's version of events contributed to a finding of probable cause. *See, e.g.*, *United States v. Santos*, 403 F.3d 1120, 1127, 1129 (10th Cir. 2005) ("Confusion about details is often an indication that a story is being fabricated on the spot."); *United States v. McRae*, 81 F.3d 1528, 1534–35 (10th Cir. 1996).  While the Court did not find the inconsistencies particularly significant in its review of the CD recording, the officers found these facts noteworthy in their finding of probable cause. *Williams*, 271 F.3d at 1269 (concluding that Court must give appropriate deference to a trained officer's findings).  At the hearing, this finding was not disputed by Defendant, nor were the officers cross-examined on this issue. Accordingly, the Court must defer to the trained officers and include these facts in its totality-of-the-circumstances calculus.

15.   In sum, the Court concludes that, considering the totality of the circumstances, the seizure of Defendant's vehicle was supported by probable cause, based on the tip provided by the reliable confidential informant, the officers' ability to corroborate the tip through their

questioning and observations, the nervousness of Mr. Jones, the inconsistencies between Mr. Jones' and Defendant's stories, and Mr. Jones' hesitation in answering the officers' questions.

*The Good-Faith Exception Applies & The Search Warrant Was Supported by Probable Cause*

16. Defendant next argues that the search warrant was defective because the "grounds for the warrant, as laid out in the affidavit prepared by Sargent [sic] Luke De La Garza, do not rise to the level of probable cause." (Doc. 77 at 3.)

17. The government asserts that the Court need not consider whether the warrant was supported by probable cause because, even if the search warrant was not valid, the evidence seized must be admitted under the vehicle exception to the Fourth Amendment. (Doc. 78 at 13–14.) The vehicle exception, however, only applies when a car is searched immediately; in contrast, where a car is seized and impounded, rather than the officer performing a search on the spot, a warrant must be obtained. *Chambers*, 399 U.S. at 51 ("either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search"). Consequently, the Court must consider the validity of the warrant because, once the car was seized and towed to the Lordsburg Police Department, any search by the officers was unlawful, unless performed pursuant to a valid warrant.

18. Next, the government argues that, even if the warrant was defective, the officers carried out the search in good faith, reasonably relying on a facially valid warrant; and therefore, any evidence seized should not be suppressed. *See United States v. Leon*, 468 U.S. 897, 919–20 (1984) (holding that the Fourth Amendment should not bar the introduction of evidence that was obtained by police officers who were acting in good faith and relying on a facially-valid

16

search warrant).

19.    Defendant counters that the good-faith exception should not apply because the officers did not act in objective good faith; however, Defendant failed to identify how the officers violated any of the four circumstances discussed in *Leon*, 648 U.S. at 922–23, under which an officer would not have reasonable grounds for believing a warrant was valid.

20.    Rather, Defendant broadly alleges that Sgt. De La Garza and the Lordsburg Police Department are engaged in a pattern and practice of stopping vehicles for traffic violations, and then attempting to develop probable cause so they can search the vehicles. (Doc. 77 at 3.)   Defendant presented no evidence of this alleged unlawful practice, other than a citation to *United States v. Gutierrez*, No. 09-cr-760 RB, a traffic stop and seizure case involving Sgt. De La Garza recently tried before this Court.   During the *Gutierrez* trial, however, there was no evidence of a pattern or practice of pretextual stops by Sgt. De La Garza or the Lordsburg Police Department.   Accordingly, the Court concludes that the good-faith exception applies in the case at hand.

21.    Ultimately, Defendant's principle argument against the validity of the warrant is that, because the affidavit lacked any information concerning the reliability of the confidential informant, it did not provide a sufficient basis for a finding of probable cause (Doc. 77 at 3); however, as previously discussed, the "failure of an affidavit to discuss the reliability of an informant does not automatically preclude a finding of probable cause." *United States v. Avery*, 295 F.3d 1158, 1167 (10th Cir. 2002).   Thus, although the affidavit did not contain any statement concerning the informant's past reliability or the source of his information, it provided "sufficient independent corroboration . . . to establish the veracity of the informant." *Danhauer*, 229 F.3d at 1006.

17

22.     In sum, the Court concludes that the good-faith exception applies in the case at hand; and furthermore, the affidavit provided sufficient grounds to support a finding of probable cause based on the tip provided by the confidential informant, the corroboration of the informant's information through the officers' investigation, Mr. Jones nervousness, and the inconsistencies between Defendant's and Mr. Jones' stories.

## CONCLUSION

Defendant asserts that his Fourth Amendment right to be free from unreasonable searches and seizures was violated and asks this Court to suppress the evidence seized from his pickup truck following a traffic stop in Lordsburg, New Mexico on February 17, 2010.  Defendant first argues that officers violated his Fourth Amendment rights by unlawfully seizing his pickup truck without probable cause.  The Court concluded that the seizure of defendant's vehicle was supported by probable cause based on the confidential informant's tip, the officers' corroboration of that tip through their investigation, Mr. Jones' nervousness, and the inconsistencies between Defendant's and Mr. Jones' stories.

Next, Defendant argues that the good-faith exception does not apply in the case at hand, and the search warrant affidavit did not support a finding of probable cause; therefore, the evidence seized pursuant to the warrant must be suppressed.  The Court concluded that the good-faith exception applies in the case at hand, but even if it did not, the affidavit provided sufficient grounds to support a finding of probable cause based on its description of the confidential informant's tip, the corroboration of this information through the officers' investigation, Mr. Jones nervousness, and the inconsistencies between Defendant's and Mr. Jones' stories.

In conclusion, suppression of evidence seized during the search of Defendant's vehicle is not warranted, as the initial seizure of Defendant's vehicle was lawful, the good-faith exception applies, and the search warrant was supported by probable cause.

**WHEREFORE,**

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress (Doc. 64) is **DENIED**.

**ROBERT BRACK**
**U.S. DISTRICT COURT JUDGE**